752 So.2d 806 (2000)
STATE of Louisiana in the Interest of J.A., et al.
No. 99-CJ-2905.
Supreme Court of Louisiana.
January 12, 2000.
*807 Frances M. Breyne, Giustina Lefante-Persich, New Orleans, Sherry Watters, Abita Springs, Counsel for Applicant.
Eileen L. Mahoney, Metairie, Tracy Roberts Bishop, Laurie Michele Chess, Virginia W. Gundlach, New Orleans, Thomas E. Dunn, Mandeville, Counsel for Respondent.
KNOLL, Justice.[*]
This is a proceeding to involuntarily terminate parental rights. The sole issue presented for our determination is whether evidence of a parent's mental illness may be excluded under the health care provider-patient privilege in a termination of parental rights proceeding brought under LA. CHILD. CODE art. 1015(5). After a careful and thorough review of the record and the law, we conclude for the reasons expressed below that the lower courts erred in precluding the evidence proffered by the State. All parties having stipulated that the child was a child in need of care, this termination proceeding was based on abuse or neglect of a child or the cause of such a condition, and thus LA. CHILD. CODE art. 1034(D) statutorily waives the privilege and precludes the exclusion of the proffered evidence. Accordingly, we vacate and set aside the judgments of the lower courts and remand this case to the juvenile court for an expedited reconsideration of its judgment based on all the evidence consistent with this opinion.

FACTS
The minor child J.A.[1] was born January 9, 1996. At the time of his birth, J.A.'s mother, L.A., was a patient at Southeast Louisiana State Hospital in Mandeville, Louisiana. L.A. has a lengthy mental history of chronic schizophrenia, disorganized type, requiring numerous hospitalizations before and after J.A.'s birth. No father was listed on J.A.'s birth certificate; however, W.K., also a patient at Southeast Louisiana State Hospital, acknowledged that he was J.A.'s alleged father but took no action to record paternity.[2] Two days later on January 11, 1996, J.A. was placed in the custody of the State of Louisiana, Department of Social Services, Office of Community Services ("DSS/OCS") and has remained in its custody since that date. On May 23, 1996, the juvenile court adjudicated J.A. as a child in need of care. Subsequently, the court approved a case plan for services for the safe return of J.A. to L.A.

*808 PROCEDURAL HISTORY
On September 17, 1997, more than eighteen months after the State had removed J.A. from L.A.'s custody, DSS/OCS sought termination of L.A.'s parental rights under LA. CHILD. CODE. art. 1015(5). Counsel for both parties stipulated that J.A. was adjudicated a child in need of care and that there was a court-approved case plan for services for the safe reunification of J.A. and L.A. To achieve reunification, L.A. was to: (1) follow the recommendations of her treating physicians; (2) obtain and maintain independent living; (3) participate in parenting classes; and (4) gain employment or a method of income.
To prove that termination of L.A.'s parental rights was in J.A.'s best interest and to prove the statutory requirements of article 1015(5), DSS/OCS attempted to introduce the testimony of L.A.'s treating physicians and social workers. Counsel for L.A.[3] objected to this testimony and the introduction of the records, claiming that under LA.CODE EVID. art. 510 and State in the Interest of S.D.B., 620 So.2d 824 (La.1993), the evidence offered was inadmissible pursuant to the health care provider-patient privilege. The trial court sustained the objection, concluding that, unlike abuse and neglect cases, no exception to the statutory privilege existed under article 1015(5) governing a termination of parental rights case based on the amount of time the child has been in State custody. Thus, because L.A. had not waived the privilege, the confidential information of the medical team concerning "advice, diagnosis or treatment" was privileged.
As for the testimony considered privileged, DSS/OCS offered the testimony of the following health care providers: (1) Dr. Roger Wortham, a psychiatrist at Southeast Louisiana Hospital, accepted by the termination court as an expert in the field of psychiatry, and one of L.A.'s treating physicians; (2) Dr. Seth L. Strauss, a staff psychiatrist at Southeast Louisiana Hospital, accepted by the termination court as an expert in the field of psychiatry, and one of L.A.'s treating physicians; (3) Ms. Gail Fitzmorris, a social worker at Southeast Louisiana Hospital, accepted by the termination court as an expert in the field of social work, and one of L.A.'s treating social workers; (4) Ms. Jolene Del Cambre, a mental health social worker at Southeast Louisiana Hospital, accepted by the termination court as an expert clinician in the field of social work, and one of L.A.'s treating social workers; and (5) Dr. Rennie Culver, a psychiatrist appointed by the juvenile court in the Child in Need of Care ("CINC") proceeding as a result of the court-approved case plan to evaluate L.A., accepted by the termination court as an independent expert in the field of psychiatry, but not court-appointed in the termination proceedings. The trial court refused to allow the testimony of these health care providers based on article 510(B)(1)'s privilege. Over objection, DSS/OCS proffered the direct testimony of these health care providers and counsel for L.A. proffered their cross-examination testimony. Finally, over objection, DSS/OCS proffered the "pink folder"[4] and L.A.'s *809 medical reports, which the juvenile court held inadmissable.
The trial court did allow DSS/OCS to present the testimony of Donna Downing, a supervisor at DSS/OCS. Ms. Downing was the supervising case manager assigned to J.A.'s case in January 1996 when he was placed in foster care and referred to DSS/OCS for placement and follow-up services. As the supervisor, she noted that she had a great deal of involvement in J.A.'s case. Ms. Downing stated that DSS/OCS's initial goal was reunification, and, as such, devised a case plan for the family. Ms. Downing testified that DSS/ OCS held the initial case plan, the "first family team conference," at Southeast Louisiana Hospital because of L.A.'s hospitalization and discussed the court-approved case plan with L.A. The case plan structured for L.A. included following all recommendations of her treating physicians while in the hospital, taking all prescribed medications, and not discontinuing any medications without consulting her physicians. If she was discharged, L.A. was to follow all aftercare recommendations for treatment, receive periodic drug screenings, take medications as prescribed, and consult with her physicians if she had any difficulties. Additionally, she was to attend parenting skill classes, to obtain and maintain stable housing or have some sort of living arrangement where she could raise J.A., and to gain some form of employment or method of income. Ms. Downing testified that the initial case plan did not change significantly over time as L.A.'s chronic hospitalization prevented her from attending any parenting classes, obtaining or maintaining independent housing, or obtaining a method of income.
Ms. Downing also testified as to the visitations between J.A. and L.A. She described the interaction between mother and child as L.A. "playing mother." She noted that L.A. became angry when J.A. did not immediately come to her and she became frustrated at the efforts she had to make with J.A. Ms. Downing stated that J.A. usually looked to either herself, the case manager, or DSS/OCS's transportation driver for comfort or reassurance during the visits. She also maintained that it was DSS/OCS's position that J.A. would be at high risk if he returned to live with L.A.
On cross examination, Ms. Downing admitted that J.A. likely looked to DSS/OCS employees for comfort because he was exposed to them more often and that, as a result, DSS/OCS had considered a plan to increase the number of visitations between J.A. and L.A. However, DSS/OCS could not schedule more visits because of L.A.'s hospitalization. Ms. Downing also admitted that she was not present at all of the visitations but only about five. Ms. Downing also stated that when she was present she would offer L.A. encouragement and ideas on how to engage J.A. She reiterated that the basis for the termination proceeding was that L.A. had not rehabilitated satisfactorily and was not expected to do so. She admitted that eventually DSS/ OCS decided not to refer L.A. to parenting skill classes due to her mental health problems. She further testified that pursuant to the CINC court's order, if L.A. failed to sign medical release forms she could not visit J.A. In April 1997, Ms. Downing stated that DSS/OCS determined that reunification was unachievable and an alternative plan was necessary.
Following the conclusion of DSS/OCS's case-in-chief, L.A. moved for a directed verdict.[5] The trial court took this motion under advisement until the next day. The following day the court denied the motion. Counsel for L.A. presented no witnesses or evidence to the court and submitted the matter for adjudication.
Immediately after submission, the trial court ruled orally from the bench. The court reiterated that the testimony of many of DSS/OCS's witnesses was inadmissible *810 under LA.CODE. EVID. art. 510(B)(1) and State in the Interest of S.D.B., 620 So.2d at 824. The court noted that LA. CHILD. CODE. art. 1034(D) was not applicable to this termination of parental rights case as it did not consider this an abuse or neglect case. Because the health care provider-patient privilege exception was not applicable, the trial court held that it could not address the issue of L.A.'s mental health. Finally, the court concluded as follows:
Since Ms. Downing was the only witness to testify and whose testimony was somewhat flawed, suspect, and in some instances impeached on cross-examination, the State has failed to prove its case by clear and convincing evidence and the case is dismissed.
Had the Court's hands not been tied by Article 510, the Code of Evidence, and by the Supreme Court's ruling in State in the Interest of S.D.B., the decision may have been otherwise. The Court would have had access to medical evidence which could have resulted in a different decision.
Had the State requested that the Court appoint an independent expert as provided in Article 1026 of the Children's Code, such an examination would have assisted the Court in determining the mental condition of the parties and the parent's ability to parent, and again, the decision of the Court may have been otherwise.
On appeal, the Fourth Circuit affirmed the judgment in an unpublished opinion. Concerning the trial court's refusal to take judicial notice of the CINC record adjudicated in another division of the Orleans Juvenile Court, the court noted that while LA. CHILD. CODE art. 1036.1 permitted its introduction, DSS/OCS was not prejudiced because of the stipulation.
Regarding whether the trial court properly excluded the medical evidence, the court of appeal held that by the plain wording of article 1034(D), testimony relevant to the abuse or neglect of a child may not be excluded on any ground of privilege. Thus, the appellate court reasoned, because DSS/OCS based this termination proceeding on the length of time J.A. had been in state custody and not on any allegations of abuse or neglect, the trial court correctly excluded the testimony and evidence relative to advice, diagnosis, and treatment of L.A. Finally, the court of appeal remanded the case to the trial court and ordered it to appoint an expert to conduct a psychiatric examination of L.A. in an expeditious manner and report her condition to the court without violating the health care provider-patient privilege. We granted DSS/OCS's writ of certiorari to consider the correctness of the lower courts' judgments. State in the Interest of J.A., 99-2905, 1999 La. LEXIS 3122, at *1 (La.11/5/99), 750 So.2d 973.[6]

LAW AND ANALYSIS
In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, Lassiter v. Department of Soc. Servs., 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship, State in Interest of Delcuze, 407 So.2d 707 (La.1981). However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that *811 prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. Lehman v. Lycoming County Children's Serv.'s Agency, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); see also State in the Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445, 452. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. See, e.g., State in the Interest of S.M., 719 So.2d at 452; State in the Interest of A.E., 448 So.2d 183, 186 (La.App. 4 Cir.1984); State in the Interest of Driscoll, 410 So.2d 255, 258 (La.App. 4 Cir.1982).
The State's parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. LA. CHILD. CODE art. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. State in the Interest of A.E., 448 So.2d at 185.
Title X of the Children's Code governs the involuntary termination of parental rights. LA. CHILD. CODE art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. The State need establish only one ground, LA. CHILD. CODE art. 1015, but the judge must also find that the termination is in the best interest of the child. LA. CHILD. CODE art. 1039. See State in Interest of ML & PL, 95-0045 (La.9/5/95), 660 So.2d 830, 832. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. LA. CHILD. CODE art. 1035(A); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that the minimum standard of proof in termination of parental rights cases is clear and convincing evidence). In this case, DSS/OCS sought termination of L.A.'s parental rights under LA. CHILD. CODE art. 1015(5), which provides:
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his needs for a stable and permanent home.
Based on L.A.'s objection, the court excluded the proffered evidence concluding that its admission would violate the health care provider-patient privilege found in LA. CODE EVID. art. 510. Article 510(B)(1) provides, in part, as follows:

*812 In a non-criminal proceeding, a patient has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication made for the purpose of advice, diagnosis or treatment of his health condition between or among himself or his representative, his health care provider, or their representatives.
However, article 1034(D) of the Children's Code provides an exception to this statutory privilege by providing as follows:
Testimony or other evidence relevant to the abuse or neglect of a child or the cause of such condition may not be excluded on any ground of privilege, except in the case of communications between an attorney and his client or communications between a priest, rabbi, duly ordained minister, or Christian Science practitioner and his communicant.
(emphasis added).
L.A. argues that the lower courts did not err because article 1034(D) plainly provides that testimony and other evidence relevant to the abuse or neglect of a child or the cause of such condition shall not be privileged in parental termination proceedings. Thus, she argues, this provision is not applicable in this proceeding because DSS/OCS based the termination of L.A.'s parental rights upon LA. CHILD. CODE art. 1015(5) and the amount of time J.A. has been in the custody of the State and not upon any abuse or neglect. Further, L.A. argues that this case could not be based on abuse or neglect because J.A. was removed from her care and custody at birth, and, therefore, she could not have abused or neglected him.
DSS/OCS argues that the lower courts erred in excluding the proffered evidence by applying LA.CODE EVID. art. 510 to these proceedings and failing to apply LA. CHILD. CODE art. 1034(D)'s exclusion to this proceeding. DSS/OCS argues that the exception is applicable to the termination of L.A.'s parental rights as this involuntary termination proceeding was premised on the stipulation that the juvenile court had previously adjudicated J.A. a child in need of care, and therefore, this was a proceeding based on abuse or neglect.
We begin by noting that courts should be cognizant of the fact that the Legislature has expressed its intent that courts shall construe the procedural provisions of Title X of the Children's Code relative to the involuntary termination of parental rights liberally. LA. CHILD. CODE art. 1001. We conclude that the lower courts erred in failing to recognize that because J.A. was adjudicated a child in need of care as alleged in the CINC petition and stipulated to by all counsel in the case sub judice, DSS/OCS's termination proceeding was based on the premise that J.A. was an abused or neglected child. Specifically, DSS/OCS based the CINC proceeding and this involuntary termination proceeding on the alleged ground that J.A. was a neglected child.
Before a juvenile court may adjudicate a child in need of care under Title VI of the Children's Code, the State must allege and prove by a preponderance of the evidence one or more of the statutorily expressed allegations in LA. CHILD. CODE art. 606(A). See LA. CHILD. CODE arts. 606, 665, 666. Specifically, article 606(A) provides as follows:
Allegations that a child is in need of care must assert one or more of the following grounds:
(1) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.
(2) The child is a victim of neglect.
(3) The child is without necessary food, clothing, shelter, medical care, or supervision because of the disappearance or prolonged absence of his parent or when, for any other reason, the child is placed at substantial risk of imminent *813 harm because of the continuing absence of the parent.
(4) As a result of a criminal prosecution, the parent has been convicted of a crime against the child who is the subject of this proceeding, or against another child of the parent, and the parent is now unable to retain custody or control or the child's welfare is otherwise endangered if left within the parent's custody or control.
(5) The conduct of the parent, either as principal or accessory, constitutes a crime against the child or against any other child of that parent.
A reading of this statute makes clear that all of the grounds listed as required showings are based on either abuse or neglect, criminal and noncriminal. Thus, before a child may be adjudicated a child in need of care, the court must first make a predicate finding of abuse or neglect. Here, one of the statutory grounds provided for in article 606 that the State must allege and prove is that the "child is a victim of neglect." LA. CHILD. CODE art. 606. As used in Title VI, the Code defines "neglect" as follows:
"Neglect" means the refusal or willful failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child's physical, mental, or emotional health is substantially threatened or impaired. Consistent with Article 606(B), the inability of a parent or caretaker to provide for a child due to inadequate financial resources shall not, for that reason alone, be considered neglect....
LA. CHILD. CODE art. 603(14).
The Legislature defined a "neglected" child in broad terms precisely because foreseeing all the possible factual situations that may arise is impossible. Further, the broad definition enables experienced juvenile courts to apply their training and experience to the unique facts and circumstances of each case. The proposition asserted by L.A. that J.A. cannot be a neglected child because he has never been in her custody would compel the juvenile court judge to place the child in her custody to determine whether she could render proper care, and ignores the possibility that if the "experiment" proves unsuccessful, the consequences to the child could be seriously detrimental or even fatal. We choose not to force the hand of the juvenile court by foreclosing prognostic evidence as did the lower courts, especially considering the Legislature's liberalization of the procedural rules. LA. CHILD. CODE art. 1001. Instead, applying the heightened clear and convincing standard of proof best protects the parents' rights and interests in termination cases.
DSS/OCS alleged in its petition that the court approved a case plan for services for the safe return of J.A., but that L.A. had made no substantial compliance. The petition also alleged as follows:
Despite the interventions attempted, there is no reasonable expectation of significant improvement in [L.A.'s] condition or conduct in the near future considering the child's age and his need for a stable and permanent home, to wit:
1. A mental deficiency renders [L.A.] incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm based on the expert opinion or pattern of behavior;
. . . .
3. The mother has a condition of chronic schizophrenia, disorganized type, which makes her unable to provide an adequate permanent home for the child based on expert opinion or a pattern of behavior;
4. The child, [J.A.], is one and a half years of age and has been in DSS/ OCS custody since the time of his birth on January 9, 1996. The child needs a stable and permanent home and cannot wait any longer for [L.A.] to rehabilitate.
*814 DSS/OCS's CINC petition alleged that J.A.'s mental and/or emotional condition was substantially threatened or impaired and that he was without proper parental care, control, food, clothing, shelter, medical care, counseling, education and supervision necessary for his well-being. By tracking the language of article 603(14), DSS/OCS clearly alleged that J.A. was a victim of neglect, and, therefore, a child in need of care. The CINC juvenile court adjudicated J.A. a child in need of care on May 22, 1996. The parties stipulated in this termination proceeding that J.A. was a child in need of care. While it is true that DSS/OCS's petition for involuntary termination of L.A.'s parental right is based on the amount of time since J.A. was removed from her custody, no substantial compliance by L.A. with the case plan, and no reasonable expectation of significant improvement in the parent's condition in the near future, the predicate to the petition and the underlying action remains the neglect of the child and the cause of such condition. The juvenile court may advance a termination proceeding predicated under article 1015(5) only after an adjudication of abuse or neglect under Title VI resulting in a finding of a child in need of care. Because article 1015(5) requires a prior court order of custody, the statute presumes the child, having been adjudicated a child in need of care, is abused or neglected and that this termination proceeding is based on "abuse or neglect or the cause of such condition." As such, the "abuse or neglect or cause of such condition" predicate for the statutory waiver of the health care provider-patient privilege was a fortiori established by the parties' stipulation. Therefore, we conclude that because the parties stipulated that J.A. was a child in need of care, this involuntary termination proceeding to sever L.A.'s parental rights was based on the neglect of J.A.
Accordingly, we conclude that trial court erred in excluding the evidence proffered by DSS/OCS under the health care provider-patient privilege. Because article 1034(D) provides that the proffered evidence, all relevant to the "neglect" of J.A. and "the cause of such condition," should not have been excluded, the court of appeal erred in affirming the trial court's judgment.[7] We must reverse.
We note that a finding of mental illness, standing alone, is insufficient grounds to warrant termination of L.A.'s parental rights. See LA. CHILD. CODE art. 1015, see also State in the Interest of August v. Fontenot, 554 So.2d 244 (La.App. 3 Cir. 1989). Instead, the mental deficiency must be related to the parenting ability. That is, if the evidence provides clear and convincing evidence that the prognosis for L.A.'s recovery in the near future is poor and there is no reasonable expectation of significant improvement in her condition in the near future, then termination is proper if it is in the best interests of the child and the additional grounds for termination have been met. LA. CHILD. CODE art. 1015(5).
In keeping with the codal dictate that the paramount interest in termination proceedings is the best interest of the child and the dictate of LA. CHILD. CODE art. 1001.1 that proceedings held under Title X of the Children's Code shall, to the extent practicable, be given priority, this Court in exercising its supervisory jurisdiction orders that on remand this case shall proceed expeditiously and within the following time frames to the extent practicable: (1) the juvenile court shall review all the *815 proffered evidence consistent with this opinion and reconsider the petition for the termination of L.A.'s parental rights and any related issues within twenty days from remand or after the disposition of rehearing should one be filed; (2) the juvenile court shall set the return day of the appeal, should one be requested, no more than fifteen days from the signing of a judgment or from the mailing of notice of the judgment, if required; and (3) in this event, the court of appeal shall decide the appeal within twenty days of the lodging of the record on appeal by assigning it for expeditious treatment with preference and priority.

DECREE
For the foregoing reasons, the judgments of the lower courts are vacated and set aside, and this case is remanded to the juvenile court for a reconsideration of its judgment on the petition for the involuntary termination of parental rights to be held expeditiously and according to the time frame established herein.
JUDGMENTS VACATED AND SET ASIDE; CASE REMANDED WITH INSTRUCTIONS FOR EXPEDITIOUS TREATMENT.
NOTES
[*] Marcus, J., not on panel. See La. S.Ct. Rule IV, Part II, § 3.
[1] The initials of the parties will be used to protect and maintain the privacy of the minor child involved in this proceeding.
[2] Following rendition of the trial court's judgment but prior to the court of appeal's judgment, blood tests proved that W.K. was not J.A.'s father. Consequently, W.K. was dismissed from the case. Accordingly, this opinion addresses only the termination of L.A.'s parental rights.
[3] We note that counsel for L.A., Mr. Thomas E. Dunn, represented her through the New Orleans Pro Bono Project by appointment in this matter. His services and representation of L.A. throughout this case were exemplary and commendable.
[4] The "pink folder" refers to the record from the CINC proceeding, case number 96-012-01-T-F. At the time this case was heard, it was the policy of the Orleans Parish Juvenile Court that one judge hear the CINC case and another judge hear, if required, the subsequent termination proceeding. The logic of the court was that the CINC proceeding and the termination proceeding are two distinct causes of action and if the same judge heard both cases, that judge would be prejudiced or biased. That was the proceeding utilized in this case. As such, when DSS/OCS attempted to introduce the CINC pink-folder, the trial court in this termination proceeding refused to accept it noting the court's bifurcated policy. Nonetheless, this policy and the logic expressed by the trial court to exclude the folder cannot override the Children's Code as expressed in article 1036.1.
[5] Although counsel for L.A. termed the oral motion as a directed verdict, being a bench trial, the trial court properly treated the motion as an involuntary dismissal.
[6] La. S.Ct. Rule XXXIV provides special appeal and writ procedures for the filing and expeditious review of writ applications, and the prompt hearing and deciding of cases adversely affecting children. In accordance with our rule, we expedited our consideration of DSS/OCS's writ application and, once granted, promptly scheduled and heard this case on our next available docket.
[7] We recognize that the amendment to article 1034 by 1997 La. Acts 256, § 1 effectively overruled our summary decision in State in the Interest of S.D.B., 620 So.2d at 824 (holding that the fact that informed communications between patient and health care provider are relevant to termination proceedings did not remove the right to invoke the privilege) in favor of the court of appeal's summary decision in State in the Interest of S.D.B., 617 So.2d 620, 620-21 (La.App. 2 Cir.1993) (holding that the communications between parent and health care providers were relevant in parental termination proceedings, and thus the exception to the privilege was applicable).